IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

PENNSYLVANIA NATIONAL           )
MUTUAL CASUALTY                 )
INSURANCE COMPANY,              )
                                )
          Plaintiff;            )
                                )
     vs.                        )          2:11-cv-0124-LSC
                                )
COCHRANE ROOFING &              )
METAL CO., INC., et al.,        )
                                )
          Defendants.           )

**MEMORANDUM OPINION**

## I.  Introduction.

Before the Court is Plaintiff Pennsylvania National Mutual Casualty Insurance Company's ("Penn National") Motion for Summary Judgment (Doc. 30), filed on May 17, 2012. For the reasons described below, Penn National's motion is due to be GRANTED in part and DENIED in part.

## II.  Facts.

Penn National issued a Commercial General Liability (CGL) Policy (the "Policy"), to Cochrane Roofing & Metal Co. ("Cochrane") for the period of

December 1, 1999 to December 1, 2000, and renewed coverage thereafter for successive periods through December 1, 2009. (Doc. 31, Ex. D.) Penn National filed this action for Declaratory Judgment on January 13, 2011 (Doc. 1), seeking a determination of whether it has a duty under the Policy to defend and/or indemnify either Cochrane or Traweek & Associates, Inc. ("Traweek"), against claims asserted by Highland Plaza Condominiums, Inc. ("Highland Plaza") in a lawsuit filed in the Circuit Court of Jefferson County, Alabama (the "Underlying Lawsuit"). (Doc. 31, Ex. A.)

In May of 2000, Highland Plaza hired Traweek, an architectural firm, to determine the cause of leaks in the roof of the Highland Plaza Condominiums (the "Premises") and to recommend solutions for remedying the problem. Following its inspection, Traweek recommended re-roofing the Premises, and it arranged for Cochrane to perform the work. Cochrane then inspected the premises and proposed installing an EPDM roofing membrane (the "Roofing System") manufactured by Carlisle Syntec Corporation ("Carlisle"). The Roofing System would be accompanied by a ten year warranty from Carlisle.

On November 3, 2000, Highland Plaza entered into an Abbreviated Form of Agreement Between Owner and Contractor (the "Contract") with Cochrane,

Traweek, and Carlisle for re-roofing the Premises. Prior to commencement of the work, Carlisle sent an authorized agent to inspect the existing roof. Carlisle's agent observed moisture in the roof's sub-structure, and based on this observation recommended upgrading the Roofing System to one with mechanical fasteners, as opposed to one fully adhered with glue. Carlisle also agreed to provide a fifteen year warranty with the upgraded Roofing System. A change-order reflecting these changes was entered on January 11, 2001 (Doc. 31, Ex. B at 12), which was the approximate date that work on the project commenced.

Cochrane completed installation of the Roofing System in February 2002. After the installation was completed, Carlisle provided Highland Plaza with its "Golden Seal Total Roofing System Warranty" (the "Warranty"), wherein Carlisle agreed to repair any leak in the Roofing System for a period of fifteen years beginning on February 13, 2002, the date Carlisle accepted installation. (Doc. 31, Ex. C.) The Warranty further provided that Carlisle would repair any leak caused by any defect in the materials or workmanship by its authorized installer, Cochrane.

In July 2004, Highland Plaza began experiencing roof leaks in various locations. Highland Plaza notified Carlisle about these leaks, and Carlisle, through its authorized installer Cochrane, made repairs to the Roofing System pursuant to its obligations

under the Warranty. These repairs, however, did not completely rectify the Roofing System's problems. The roof experienced further leaking problems on several occasions in 2007 and 2008, and each time Cochrane was dispatched to attempt repairs.

Unsatisfied with the Roofing System and the attempted repairs, Highland Plaza filed the Underlying Lawsuit on May 12, 2010, seeking compensatory and punitive damages, including costs to repair the still-leaking Roofing System, damages to the Premises' roofing substructure and underlying insulation, and damages to personal property located inside the Premises. (Doc. 31, Ex. A.) The complaint in the Underlying Lawsuit asserts various claims against both Cochrane and Traweek:[1] (1) that Traweek and Cochrane negligently installed the Roofing System (Count III) (Doc. 31, Ex. A ¶¶ 47–52); (2) that Cochrane negligently failed to remedy and repair defects caused by the negligent installation (Count II) (*Id.* ¶¶ 41–46); and (3) that Traweek defrauded Highland Plaza by knowingly making false representations regarding the effectiveness of installing the Roofing System (Count IV) (*Id.* ¶¶ 53–56).

On May 17, 2010, five days after the Underlying Lawsuit was filed, Cochrane notified Penn National about the claims alleged by Highland Plaza in the Underlying

---

[1] The Underlying Lawsuit also asserts claims against Carlisle. However, because the claims against Carlisle are irrelevant to this action, they are omitted from the Court's discussion.

Lawsuit and sought defense and indemnification based on the Policy. (Doc. 31, Ex. E.) Shortly after Cochrane notified Penn National about the claim, Traweek also made a demand for Penn National to provide defense and indemnity under the Policy.  (Doc. 31, Ex. F.) Although not a named insured under the Policy, Traweek asserts coverage based on one of the various Automatic Additional Insured ("AAI") Endorsements issued by Penn National. (*See* Doc. 31, Exs. G, H, & I.)

Penn National agreed to defend, and presently is defending, Cochrane in the Underlying Lawsuit subject to a reservation of rights (Doc. 31, Ex. K), but it refused to provide a defense for Traweek. (Doc. 31, Ex. J.) On January 13, 2011, Penn National filed this declaratory judgment action, seeking to have the Court declare that it does not have a duty to defend or indemnify either Cochrane or Traweek. (Doc. 1.)

After a period of discovery, Penn National filed the present motion asking the Court to enter summary judgment in its favor on the issue of whether it has a duty to defend[2] Traweek or Cochrane. (Doc. 30.) In its motion, Penn National argues that it

_____

[2] Penn National's Motion for Summary Judgment is limited to the duty to defend issue because in a previous order entered by Judge Hancock, this Court stated: "This action will proceed to final ruling on the duty to defend issue. Whether Penn National has a duty to indemnify Cochrane will remain part of the case, but will not be considered by the court until the earlier of (a) final disposition of the underlying lawsuit; or (b) a ruling on the duty to defend, at which time the court will entertain any motion that the parties may wish to file concerning the dury to indemnify claim; or (c) an event not foreseeable at this time which subsequently arises and may impact the [duty] to indemnify issue." (Doc. 19 at 8.)

does not owe a duty to defend Traweek because the applicable AAI endorsement does not provide coverage for completed operations and expressly excludes coverage for architectural services. (Doc. 31 at 19–23.) Penn National additionally argues that it does not owe a duty to defend either Cochrane or Traweek because both failed to provide timely notice as required by the Policy. (*Id.* at 23–26.) Finally, Penn National argues that to the extent the Policy creates a duty to defend, that duty is limited to Highland Plaza's claims for damage to property other than the Roofing System itself. (*Id.* at 26–29.) Cochrane, Traweek, and Highland Plaza all filed briefs in response to Penn National's motion (Docs. 34, 36, & 37), and Penn National submitted a reply. (Doc. 38.) Being fully briefed, Penn National's Motion for Summary Judgment (Doc. 30) is ripe for decision.

## III.   Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[3] The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and

---

[3] Although Fed. R. Civ. P. 56 was amended on December 1, 2010, "the standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56 advisory committee's note (2010 Amendments).

identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also* Fed. R. Civ. P. 56(c). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp.*, 281 F.3d at 1224 (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV.    Analysis

### A.    Traweek

Traweek, who is not a named in the Policy, asserts coverage based on the AAI endorsements issued to Cochrane by Penn National. In 2001–2002, the time of construction, and 2004, the time of the initial roof leaks, the Policy provided the following AAI endorsement:

> The following provision is added to WHO IS AN INSURED (Section II):
>
> 5.   Any person(s) or organization(s) (referred to below as "additional insured") with whom you are required in a written construction contract or agreement to name as an additional insured **but only for "your" acts** or omissions **arising from "your" ongoing construction operations** at the location or project described in the contract or agreement.
>
> The insurance provided to the additional insured does not apply to . . . "property damage" . . . :
>
> . . . .
>
> b.   **Occurring after that portion of "your work" out of which the injury or damage arises has been put to its intended use** by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.
>
> c.   **Arising out of an architect's**, engineer's, or surveyor's **rendering of or failure to render any professional services** including:
>
> (1)   The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings, designs and specifications; and
>
> (2)   Supervisory, inspection or engineering services.
>
> These exclusions apply in addition to those contained in the Coverage Part.

(Doc. 31, Ex. G., emphasis added.)

Traweek contends that this AAI endorsement obligates Penn National to provide it a defense in the Underlying Lawsuit. Traweek's contention, however, is without merit as that the endorsement's language unambiguously excludes coverage for the claims alleged by Highland Plaza. In fact, the short endorsement provides three separate grounds for denying Traweek's demand for defense and indemnification.

First, the endorsement does not provide coverage to additional insureds for their own acts. Specifically, the endorsement provides coverage "only for 'your' acts and omissions arising from 'your' ongoing construction operations." The term "your" is defined as the "named insured," which in this case is Cochrane. Therefore, the Policy only provides coverage to Traweek for acts by Cochrane, and not for its own conduct.

Recognizing this limitation, Traweek attempts to secure coverage as an additional insured by arguing that "[t]he allegations of the Complaint [in the Underlying Lawsuit] are . . . that Traweek is liable for the acts of Cochrane." (Doc. 37 at 5.) This statement is incorrect with respect to Count IV of the complaint. Count IV alleges that Traweek defrauded Highland Plaza by knowingly making false representations regarding the effectiveness of installing the Roofing System. This

count, which does not mention Cochrane, unquestionably relates to Traweek's own conduct. Accordingly, there is no coverage for the claims in Count IV under the AAI endorsement. Count III, however, could be viewed differently. Count III asserts that both Cochrane and Traweek negligently installed the Roofing System. Traweek contends that this count attempts to hold it liable for Cochrane's actions because "Traweek did not install the roof," but "merely recommended a roof to be installed." (Doc. 37 at 6.) However, even if this is true, Traweek is still not entitled to a defense because other provisions in the endorsement provide grounds for denying coverage.

A second basis for denying Traweek's demand for a defense under the AAI endorsement is that the endorsement does not provide, and in fact expressly excludes, coverage for "completed operations." This is made clear in two different paragraphs. First, the endorsement states that coverage only applies to acts or omissions "arising from . . . ongoing construction operations." And just below that clause, the endorsement explicitly states that "[t]he insurance provided to the additional insured does not apply to . . . 'property damage' . . . [o]ccurring after that portion of 'your work' out of which the injury or damages arises has been put to its intended use . . . ."

These two clauses deny coverage for any property damage "occurring" after construction was completed in February 2002. The Policy defines an "occurrence"

as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 31, Ex D at 84.) In an effort to avoid the exclusion for completed operations, Traweek contends that the "occurrence" here was the installation of the Roofing System, and not the leaks that occurred after the roof was installed. (Doc. 37 at 7–9.) However, this argument is inconsistent with Alabama law. The Alabama Supreme Court recently held that "faulty workmanship itself is not an occurrence." *Town & Country Prop., L.L.C. v. Amerisure Ins. Co.*, 2011 WL 5009777, at *5 (Ala. Oct. 21, 2011). Rather, "faulty workmanship may lead to an occurrence if it subjects personal property or other parts of the structure to 'continuous or repeated exposure' to some other 'general harmful condition' . . . and, as a result of that exposure, personal property or other parts of the structure are damaged." *Id.*

Under Alabama law, the occurrence in this case was the leaking roof, not the Roofing System's installation. The leaks, and the property damage that resulted from the leaks, did not occur until 2004, more than two years after construction was completed. Thus, there is no basis for Traweek to demand coverage under the AAI endorsement that excludes coverage for completed operations. Notably, an AAI endorsement for completed operations was offered by Penn National at the time the construction was ongoing, but Cochrane did not obtain this coverage until 2006, after

the installation of the Roofing System was completed and after the leaks had first been identified.[4] Cochrane did not purchase the completed operations AAI endorsement for the period relevant to this dispute, but instead purchased an AAI endorsement expressly excluding such coverage. It follows, therefore, that Penn National is not obligated to defend Traweek against the claims asserted by Highland Plaza in the Underlying Lawsuit. *See R. A. Owens Const. Co., Inc. v. Employers Ins. Co. of Alabama*, 392 So. 2d 1180, 1181 (Ala. 1981) (denying coverage for damage occurring after construction completed where policy excluded coverage for completed operations).

---

[4] On December 1, 2006, Cochrane changed its coverage to include an AAI endorsement for completed operations. The 2006 Endorsement provides:

A.   The following provision is added to Section II - WHO IS AN INSURED

6.   Any person(s) or organization(s) (referred to below as additional insured) with whom you are required in a written contract or agreement to name as an additional insured for the "products-completed operations hazard", but only with respect to the liability for . . . "property damage" caused, in whole or in part, by "your work", at the location or project designated and described in the contract or agreement, performed for that additional insured **and included in the "products-completed operations hazard".**

. . . .

B.   With respect to insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to . . . "property damage" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

(1)   The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings, designs and specifications; and

(2)   Supervisory, inspection or engineering activities.

(Doc. 31, Ex. I, emphasis added.)

The Policy also provides a third potential basis for denying Traweek coverage. The AAI endorsement expressly provides that it "does not apply to . . . 'property damage' . . . [a]rising out of an architect's . . . failure to render any professional services." Traweek is an architectural firm that was hired by Highland Plaza to render an architectural opinion and to provide supervision of the re-roofing process. It is undisputed that Traweek did not actually install the roof, but rather "merely recommended a roof to be installed." (Doc. 37 at 6.) Therefore, any liability imposed on Traweek in the Underlying Lawsuit will be attributable to its failure to provide architectural or supervisory instructions regarding the roof's construction by the other defendants. Accordingly, the Policy does not afford Traweek coverage under the applicable AAI endorsement.

The arguments raised by Highland Plaza on this issue are also without merit. Highland Plaza contends that the Policy is ambiguous because "[i]t is clear on its face that Article 21 [of Highland Plaza's contract with Cochrane, Carlisle, and Traweek] and Section II [of the Policy] are conflicting and ambiguous." (Doc. 36 at 7.) Highland Plaza cites no legal authority for its position that the Policy should be found ambiguous because its terms allegedly conflict with the terms of the contract between Owner and Contractor. There can be no ambiguity in the Policy unless such ambiguity

is within the Policy itself. Highland Plaza cannot create an ambiguity by comparing language found in the Policy to language found in a completely separate agreement, particularly one to which Penn National was not even a party.

For the reasons stated, Penn National is not obligated by the Policy to provide defense for claims asserted against Traweek in the Underlying Lawsuit.

## B.     Cochrane

Although Penn National is presently defending Cochrane in the Underlying Lawsuit, it argues before this Court that it should not be required to do so because Cochrane failed to provide timely notice that there had been an "occurrence" under the Policy. The Policy included the following provisions related to the Cochrane's duty to provide notice:

> SECTION   IV   -   COMMERCIAL   GENERAL   LIABILITY CONDITIONS
> . . . .
>
> 2.     Duties In The Event Of Occurrence, Offense, Claim Or Suit
>
>     a.     You must see to it that we are notified **as soon as practicable** of **an "occurrence"** or an offense **which may result in a claim**. To the extent possible, notice should include:
>
>         (1)     How, when and where the "occurrence" or offense took place;
>
>         (2)     The names and addresses of any injured persons and witnesses; and
>
>         (3)     The nature and location of any injury or damage

arising out of the "occurrence" or offense.

    b.    If a claim is made or "suit" is brought against any insured, you must:

        (1)    Immediately record the specifics of the claim or "suit" and the date received; and

        (2)    Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

(Doc. 31, Ex. D at 80–81, emphasis added.)

These provisions set out two separate notice obligations. The first obligates Cochrane to notify Penn National "as soon as practicable" about any "occurrence" that "may result in a claim," and the second imposes a duty on Cochrane to notify Penn National after a lawsuit is filed. Penn National does not challenge Cochrane's compliance with the lawsuit notice requirement. Indeed, such a challenge would be unsuccessful as Cochrane notified Penn National a mere five days after the Underlying Lawsuit was filed. Rather, Penn National asserts that Cochrane failed to provide timely notice about an "occurrence" under the policy. Specifically, Penn National asserts that Cochrane breached the notice obligation because it was "aware of leaks in 2004, but only provided notice to Penn National six years later." (Doc. 38 at 9, emphasis omitted.)

The Policy requires notice be given "as soon as practicable." Under Alabama law, the phrase "as soon as practicable" is construed to require notice "within a

reasonable time in view of the facts and circumstances of the case." *Pharr v. Continental Casualty Co.*, 429 So. 2d 1018, 1019 (Ala. 1983). "[T]here are only two factors to be considered in determining the reasonableness of a delay in giving notice to an insurer: the length of the delay and the reasons for the delay." *Southern Guar. Ins. Co. v. Thomas*, 334 So. 2d 879, 883 (Ala. 1976). "Where facts are disputed or where conflicting inferences may reasonably be drawn from the evidence, the question of the reasonableness of a delay in giving notice is a question of fact for the jury." *Id.* at 882 (citation omitted). "However, where an insured fails to show a reasonable excuse or the existence of circumstances which would justify a protracted delay, the Court should as a matter of law hold that there has been a breach of the condition as to notice." *Id.* at 882–83.

Delay may be excusable where the accident or occurrence would not put a reasonable person on notice that a claim for damages may arise. In *Pan Am. Fire & Cas. Co. v. DeKalb-Cherokee Counties Gas Dist.*, the Alabama Supreme Court stated:

> Generally, delay is excusable in the case of an accident which is trivial . . . or which furnishes no ground for [an] insured, acting as a reasonable and prudent man, to believe at the time that a claim for damages will arise or that the injury is one insured against. In such case notice is not required until some claim within the coverage of the policy has been presented or is reasonably to be anticipated, in which event the requirement as to notice is satisfied if notice is given within a reasonable time after the situation assumes an aspect suggestive of a possible claim for damages.

266 So. 2d 763, 771 (Ala. 1972) (quoting 40 C.J.S. Insurance § 1056, which is now found at 46A C.J.S. Insurance § 1831).

Using this line of reasoning, Cochrane argues that its delay in providing notice to Penn National was reasonable under the circumstances because it never believed the roof leaks would result in a claim. Cochrane's president testified that while he knew about the roof leaks in 2004 and 2007–2008, he never believed there had been an "occurrence" under the Policy because he simply thought Cochrane was engaging in ordinary warranty repairs. (Doc. 35, Ex. 3 at 2.) The president buttressed this belief by pointing out that he was paid for the repair services performed. (*Id.*) The president also testified that he was never notified that Highland Plaza was contemplating filing a lawsuit and that he had no knowledge of ongoing problems until the Underlying Lawsuit was filed. (*Id.*) Based on these understandings, Cochrane argues it had no way of knowing the notice obligation was triggered.

A similar argument was accepted by the Alabama Supreme Court in *CIE Service Corp. v. Smith*, 460 So. 2d 1244 (Ala. 1984). In *Smith*, the insured was a security company operating under contract to provide guard service for an apartment complex. *Id.* at 1245. While a security guard was on duty, a woman was assaulted and raped in her apartment within the complex. *Id.* Although the security company immediately

learned about the incident, it did not report it to its insurer until nearly one year later when the tenant filed a lawsuit against the company. *Id.* The insurance company denied coverage on the grounds that the security company failed to comply with the notice provision in the policy. *Id.*

The *Smith* court held that the insured's one year delay in providing notice was reasonable. 460 So. 2d at 1247. The court found it noteworthy that the security company "did not notify [the insurance company] of the occurrence because of its belief that the occurrence would not give rise to a claim against it." *Id.* at 1246. The court noted that a different result might be appropriate "if the victim of the crime . . . had told the security service that she was considering filing a claim against it, or if the security service knew that a lawsuit was being contemplated." *Id.* at 1247. However, where the security service reasonably believed no claim would be brought, there was no need to notify the insurer.

As in *Smith*, this Court is unwilling to hold Cochrane's delay in providing notice was unreasonable under the circumstances. Because Cochrane believed it was performing warranty repairs and because it was paid for its work, it had no basis "to believe . . . that a claim for damages [would] arise." *DeKalb-Cherokee Counties Gas Dist.*, 266 So. 2d at 771. The Court recognizes that the delay here was significantly

longer than in *Smith* (i.e., 6 years compared with 1 year) and that the context in which the claims arose are different (i.e., construction contract compared with criminal activity). Nonetheless, the reason for the delay is nearly identical. Where the insured has no reason to believe an accident will result in a legal claim for damages, there is no duty to notify the insurer about the incident. To hold otherwise in this instance would essentially impose a burden on construction companies to notify their insurance company anytime they are called upon to make subsequent repairs to previously completed projects. Such a requirement is not created by the Policy here, and this Court will not impose such a burden on Cochrane based on the facts of this case.

Finding that Cochrane did not, as a matter of law, fail to satisfy its notice obligation does not end the Court's analysis, however. Penn National argues that "to the extent [its] duty to defend is not defeated by late notice, Cochrane [should] only [be] afforded a defense as to claims of damage to property other than the Roofing System itself." (Doc. 30 at 2.) Penn National asserts that "any damages to the Roofing System or otherwise arising from Cochrane's work itself would not constitute an 'occurrence' under the Policy, and hence, Penn National owes no duty of defense to . . . Cochrane . . . for such claims." (Doc. 31 at 29.)

In support of its position, Penn National cites to various cases for the

proposition that faulty workmanship is not an "occurrence" under Alabama law. (Doc. 31 at 27.) While Penn National is not wholly incorrect, it has misconstrued Alabama law on this point. Under Alabama law, "claims of faulty workmanship, *standing alone*, are not 'occurrences' under CGL policies." *Town & Country Prop.*, 2011 WL 5009777, at *6 (quoting *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 73 (Ky. 2010)) (emphasis added). However, "faulty workmanship may lead to an occurrence if it subjects personal property or other parts of the structure to 'continuous or repeated exposure' to some other 'general harmful condition' . . . and, as a result of that exposure, personal property or other parts of the structure are damaged." *Id.* at *5. Indeed, in a situation much like the one before this Court, the Alabama Supreme Court held "there had been an occurrence for CGL policy purposes when the contractor's poor workmanship resulted in not merely a poorly constructed roof but damage to the plaintiff's attic, interior ceilings, and at least some furnishings." *Id.* (describing *Moss v. Champion Ins. Co.*, 442 So. 2d 26, 29 (Ala. 1983)).

The distinction Penn National draws between the damages to the Roofing System itself and damages to personal property within the Premises is not entirely insignificant. That distinction, however, is only relevant as to the scope of Penn National's duty to provide *indemnification* for damages—a question not before the

Court at this time. (*See supra* note 2.)  It is not relevant to the Court's determination of whether there was an "occurrence" triggering coverage. The "occurrence" in this case was the roof leaks that began in 2004. It would be improper to delve further and suggest that some damages arising from the leaks were occurrences and other damages were not.

Under Alabama law, "[i]t is well established that the insurer's duty to defend is more extensive than its duty to pay. If the allegations of the injured party's complaint show an accident or occurrence which comes within the coverage of the policy, the insurer is obligated to defend regardless of the ultimate liability of the insured." *Ladner & Co., Inc. v. S. Guar. Ins. Co.*, 347 So. 2d 100, 102 (Ala. 1977). *See also Tanner v. State Farm Fire & Cas. Co.*, 874 So. 2d 1058, 1065 (Ala. 2003) ("If the allegedly injured person's complaint against the insured alleges a covered accident or occurrence, then the insurer owes the duty to defend even though the evidence may eventually prove that the gravamen of the complaint was not a covered accident or occurrence."). An insurer is only relieved from its duty to defend when both "the complaint against the insured [fails to] allege a covered accident or occurrence" and "the evidence in the litigation between insurer and insured [fails to] prove a covered accident or occurrence." *Tanner*, 874 So. 2d at 1065 (citations omitted). "If the

allegedly injured person's complaint against the insured alleges or the evidence proves not only claims based on a covered accident or occurrence but also claims not based on a covered accident or occurrence, the insurer owes a duty to defend at least the claims based on a covered accident or occurrence." *Id.*

Highland Plaza's complaint in the Underlying Lawsuit asserts claims for relief due to leaks in the Roofing System installed by Cochrane. The leaking roof is an "occurrence" under the Policy, and therefore Penn National must provide a defense to Cochrane for the claims arising out of that occurrence. The obligation to provide a defense, however, does not preclude Penn National from challenging, at a later time, whether it also has a duty to indemnify Cochrane for certain damages which have been or may be awarded.

## V.     Conclusion

For the foregoing reasons, Penn National's Motion for Summary Judgment (Doc. 30) is due to be GRANTED in part and DENIED in part. Penn National has no obligation to defend Traweek in the Underlying Lawsuit. However, Penn National's request that the Court determine, as a matter of law, that it has no duty defend Cochrane is denied, because a question remains for the fact-finder about whether Cochrane's delay in providing notice of an occurrence under the Policy was

unreasonable. Penn National may, at a later time, file a motion challenging its duty to indemnify Cochrane for any damages which may be awarded. A separate order will be entered consistent with this Opinion.

Done this 3rd day of December 2012.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
[170956]